UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

James W. Gustavson,

    Plaintiff,

v.                                                    Civ. No. 03-3627 (JNE/RLE)
                                                          ORDER

Harnischfeger Corporation and
Terex Corporation,

    Defendants.

---

Gary M. Hazelton, Esq., Hazelton & Rodgers, P.C., appeared for Plaintiff James W. Gustavson.

Steven J. Kirsch, Esq., and Thomas J. Norby, Esq., Murnane, Conlin, White & Brandt, P.A., appeared for Defendants Harnischfeger Corporation and Terex Corporation.

---

James Gustavson brought this diversity action against a crane manufacturer, Harnischfeger Corporation, and its alleged successor, Terex Corporation, after he injured his left foot while operating a crane. He asserts that Harnischfeger negligently designed and manufactured the crane, that it is strictly liable for the defective design and manufacture and for failing to warn of the defects, and that it breached warranties. Harnischfeger and Terex (collectively, Defendants) move for summary judgment on the ground that Minnesota's primary assumption of the risk doctrine bars Gustavson's claims. For the reasons set forth below, the Court denies the motion.

## I.     BACKGROUND

On July 13, 1999, Gustavson was operating a P & H Model 430 Truck Crane[1] (P&H Crane) to set a two-piece house near International Falls, Minnesota. Harnischfeger had

---

[1]     Defendants describe the crane as a Model 435. Gustavson describes it as a Model 430. For present purposes, the Court assumes he was using a Model 430.

1

manufactured the crane. Each piece arrived at the site on a trailer. To set the house, employees of Dynamic Home first attached one of the pieces to the crane. Gustavson then raised the crane to lift the piece, rotated the crane to position the piece, and lowered the crane to place the piece on house settings. The employees of Dynamic Home and Gustavson repeated this process to place the second piece. After setting the house, Gustavson noticed an "underwrap" in the crane's cable, that is, that a layer of the crane's cable was not wrapped tightly on the drum such that incoming cable wedged itself between two underlying turns. To correct the underwrap, he left the crane cab, placed his right foot on a metal box above the crane deck, placed his left foot on the axle of the swing clutch, and pulled on the cable twice. There was no guard over the swing clutch, which was spinning at approximately 300 revolutions per minute. During his second pull, Gustavson slipped and fell to the left. While pulling himself forward with the cable, his left foot was pulled into the spinning swing clutch and severely injured.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must

look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under Minnesota law, the primary assumption of the risk doctrine, if applicable, relieves the defendant of a duty owed to the plaintiff. *Louis v. Louis*, 636 N.W.2d 314, 321 (Minn. 2001); *Baber v. Dill*, 531 N.W.2d 493, 495 (Minn. 1995). If the defendant owes no duty to the plaintiff, there is no need to consider the doctrine. *Louis*, 636 N.W.2d at 321; *Baber*, 531 N.W.2d at 495. In this case, Defendants concede for the purpose of this motion that they owed a duty of care to Gustavson to protect him from an unreasonable risk of harm associated with use of the P&H Crane. Accordingly, the Court considers whether Gustavson relieved Defendants of that duty by primarily assuming the risk.

"[P]rimary assumption of the risk acts as a complete bar to a plaintiff's recovery." *Schneider ex rel. Schneider v. Erickson*, 654 N.W.2d 144, 148 (Minn. Ct. App. 2002). The doctrine applies "when a party voluntarily enters into a relationship in which the plaintiff assumes well-known, incidental risks." *Id.*; *see Reimer v. City of Crookston*, 326 F.3d 957, 967 (8th Cir. 2003); *Kraft v. Ingersoll-Rand Co.*, 136 F.3d 584, 586 (8th Cir. 1998) (stating that the doctrine applies when a plaintiff manifests his acceptance of the risk and consent to look out for himself and relieve the defendant of the duty). The doctrine applies only under limited circumstances. *Reimer*, 326 F.3d at 968; *Schneider*, 654 N.W.2d at 149. "[W]here primary assumption of the risk is at issue, only those cases with overwhelming and conclusive records lend themselves to summary judgment resolution." *Reimer*, 326 F.3d at 970. The elements of primary assumption of the risk are that the plaintiff: (1) had knowledge of the risk; (2) appreciated the risk; and (3) voluntarily chose to accept the risk even though he had a choice to avoid it. *Reimer*, 326 F.3d at 966; *Kraft*, 136 F.3d at 586.

Gustavson argues that the primary assumption of the risk doctrine does not apply to products liability cases. In *Armstrong v. Mailand*, 284 N.W.2d 343 (Minn. 1979), the court held that "the doctrine of primary assumption of the risk may be utilized in actions based on strict products liability and strict liability for an abnormally dangerous activity." *Id.* at 352; *see Walk v. Starkey Mach., Inc.*, 180 F.3d 937, 939-40 (8th Cir. 1999) (affirming district court's application of doctrine to bar plaintiff's claims of negligence and strict liability based on unreasonably dangerous condition of machinery); *Andren v. White-Rodgers Co.*, 465 N.W.2d 102, 105 (Minn. Ct. App. 1991) ("Thus, primary assumption of the risk is applicable in a products liability action involving a defective product."). Accordingly, the Court rejects Gustavson's argument and turns to whether the doctrine applies in this case.

Defendants assert that Gustavson's deposition testimony reveals Gustavson knew of the risk associated with his attempt to correct the underwrap. The doctrine "requires actual knowledge of a known risk." *Reimer*, 326 F.3d at 966. Whether Gustavson had the requisite knowledge is a fact-intensive inquiry. *See id.* at 969. At his deposition, Gustavson described his career as a crane operator. Shortly after graduating from high school, he attended a vocational school for approximately one year. There, he learned to operate heavy equipment, including cranes. After completing his studies, he served in the Navy from 1967 to 1970. While in the Navy, he worked as a crane operator in Vietnam, attended the Navy's crane-operator school in California, and returned to Vietnam to operate heavy equipment, including cranes. After completing his Navy service, Gustavson worked for Paul Laurence Construction for approximately fifteen years as an operator of heavy equipment, including cranes. From approximately 1986 to July 1999, Gustavson worked for Pelland & Swenson as a crane operator. In the course of his career, he operated at least thirteen crane models and read many manuals

4

regarding the safe operation of a crane. He spent approximately 1,500 hours operating the P&H Crane before injuring his foot.

Gustavson regarded underwraps to be "as common as a cold." He corrected them in the course of his career, though his assistant, an oiler, typically corrected them. To correct underwraps on the P&H Crane, Gustavson or an oiler ordinarily stood in the same position Gustavson did immediately before his injury. If the underwrap was very loose, however, it could be corrected by shaking the cable without standing on the swing clutch axle. Gustavson did not recall how many times either he or an oiler corrected an underwrap on the P&H Crane.

At his deposition, Gustavson described the events leading up to his injury. On the night of July 12, it rained and the worksite was muddy. On the morning of July 13, someone decided that the P&H Crane would not be removed from the worksite immediately after setting the house because of the worksite's condition. Consequently, an oiler was not present to assist Gustavson. After setting the house, Gustavson noticed an underwrap. He engaged the master clutch; he considered it nearly impossible to correct an underwrap without engaging it. When the master clutch is engaged, the swing clutch spins at approximately 300 revolutions per minute. He left the crane cab and walked on to the crane deck. His boots were muddy and the crane deck was covered in mud. He placed his right foot on a metal box above the crane deck and his left foot close to the swing clutch on its axle. There was no cover for the swing clutch. He saw and heard the swing clutch spinning. He knew the swing clutch would injure him if he contacted it. With more weight placed on his left foot, he pulled the cable twice. He was not thinking about whether his muddy boots increased his risk of slipping. During his second pull, he slipped and fell to the left. While pulling himself forward, his left foot moved over the axle and was pulled into the spinning swing clutch.

Gustavson's deposition testimony reveals that he was aware of the risk of bodily injury associated with this attempt to correct the underwrap on July 13. He was an experienced crane operator. Wearing muddy boots, he placed his left foot on the axle of the swing clutch and pulled on the crane's cable. He knew that the swing clutch was spinning at approximately 300 revolutions per minute and that the swing clutch would injure him if he contacted it. Viewed in the light most favorable to Gustavson, the record reveals that he had actual knowledge of the risk of bodily injury associated with his attempt to correct the underwrap on July 13. *See Walk*, 180 F.3d at 939-40.

Turning to the second element, Defendants maintain that Gustavson's deposition testimony demonstrates he appreciated the risk associated with his attempt to correct the underwrap. Asked at his deposition whether he was "doing the best [he] could . . . to make sure [his] foot wouldn't come into contact" with the swing clutch, Gustavson replied, "Most assuredly." Viewed in the light most favorable to Gustavson, the record reveals that he appreciated the risk of bodily injury associated with his attempt to correct the underwrap on July 13. *See id.*

As to the third element, Defendants rely heavily on *Walk*. In that case, a worker was cleaning a pug mill trough. 180 F.3d at 938. His hand became entangled in an auger, which pulled his arm into the machine. *Id*. The district court held the primary assumption of the risk doctrine barred the worker's claims and the Eighth Circuit affirmed. *Id*. The Eighth Circuit's analysis rested in part on the worker's belief that the trough could be adequately cleaned with the auger disengaged. *Id*. at 940. In this case, Defendants assert that Gustavson could have: (1) lowered the boom to allow him to reach the cable without having to step on the swing clutch axle; (2) waited until he could clean the mud to decrease his chance of slipping; (3) waited until

6

he had assistance to correct the underwrap; (4) placed a guard over the swing clutch; and (5) turned off the crane and corrected the underwrap.  Gustavson testified that he could not reach the cable with the boom lowered.  There is evidence in the record to support the assertion that the underwrap had to be corrected expeditiously to avoid damage to the cable.  It could be reasonably inferred that Gustavson could not wait to correct the underwrap.  He testified that the P&H Crane did not have a dirt guard and that it is nearly impossible to correct an underwrap on the P&H Crane without engaging the master clutch.  This latter point distinguishes *Walk*.  Viewing the record in the light most favorable to Gustavson, the Court concludes that he did not voluntarily choose to assume the risk.  Accordingly, the Court denies Defendants' motion.

### III.    ORDER

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 21] is DENIED.

Dated:  June 21, 2005

 s/  Joan N. Ericksen_____
JOAN N. ERICKSEN
United States District Judge